IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

JESSICA L. MARAMBELL a/k/a IBANEZ                                    PLAINTIFF

vs.                             Civil No. 2:21-cv-02075-PKH-MEF

KILOLO KIJAKAZI, Acting Commissioner,[1]
Social Security Administration                                       DEFENDANT

### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, Jessica L. Marambell a/k/a Jessica L. Ibanez, brings this action under 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of Social Security Administration (the "Commissioner") denying her claim for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act (hereinafter "the Act"), 42 U.S.C. § 423(d)(1)(A). In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. *See* 42 U.S.C. § 405(g).

### I.        Procedural Background

Plaintiff protectively filed her application for DIB on December 19, 2017, alleging disability since September 10, 2016, due to a neck injury/pain/spasms, back injury/pain, fibromyalgia, anxiety, spasms/weakness/tingling, and numbness of the arms, legs, and hands. (ECF No. 15, pp. 27, 80-81, 93-94). Born in 1985, Plaintiff was 31 years old on her alleged onset

---

[1] Kilolo Kijakazi became Acting Commissioner of the Social Security Administration on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted as the defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

date and possessed a high school education.  (*Id*., p. 36).  She had past relevant work ("PRW") as a nurse assistant.  (*Id*., pp. 35-36).

The Commissioner denied her application initially and on reconsideration.  (ECF No. 15, pp. 105-107, 109-110).  At Plaintiff's request (*Id*., pp. 114-116), an Administrative Law Judge ("ALJ"), the Hon. Elisabeth McGee, held an administrative hearing on April 1, 2020.  (*Id*., pp. 43-77).  Plaintiff was present and represented by counsel.  (*Id*., p. 43).

On August 4, 2020, the ALJ found that Plaintiff had the following severe impairments: fibromyalgia, polyarthropathy, depression, panic disorder, personality disorder, and benign joint hypermobility (possibly Ehlers Danlos syndrome).  (ECF No. 15, p. 29).  The ALJ concluded that her impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id*., p. 30).  The ALJ determined that Plaintiff retained the residual functional capacity ("RFC") to do the following:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except the claimant is limited to occasional climbing of ramps and stairs.  The claimant is limited to occasional use of ladders, ropes and scaffolding.  The claimant is limited to occasional balancing, stooping, kneeling, crouching, and crawling.  The claimant is limited to frequent, bilateral overhead reaching.  The claimant is limited to unskilled, supervised work, that involves simple, direct and concrete work tasks. (*Id*., p. 31).

With the assistance of a vocational expert ("VE"), the ALJ found that Plaintiff could perform work as a document preparer, addressing clerk, and escort vehicle driver.  (ECF No. 15, pp. 36-37).  She concluded Plaintiff had not been under a disability as defined by the Act from September 10, 2016, through the date of the ALJ's decision on August 4, 2020.  (*Id*., p. 37).

The Appeals Council denied Plaintiff's request for review on February 5, 2021.  (ECF No. 15, pp. 5-12).  She subsequently filed a Complaint to initiate this action on April 1, 2021.  (ECF

No. 3).  This matter is before the undersigned for report and recommendation.  Both parties have filed appeal briefs (ECF Nos. 19, 20), and the case is ready for decision.

## II.      Applicable Law

This Court's role is to determine whether substantial evidence supports the Commissioner's findings.  *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010).  Substantial evidence is less than a preponderance, but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision.  *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019).  We must affirm the ALJ's decision if the record contains substantial evidence to support it.  *Blackburn v. Colvin*, 761 F.3d 853, 858 (8th Cir. 2014).  If there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently.  *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015).  In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, we must affirm the ALJ's decision.  *Id*.

A claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity.  *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see also* 42 U.S.C. § 423(d)(1)(A).  The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).  A Plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given her age, education, and experience.  20 C.F.R. § 404.1520(a)(4).  The fact finder only considers Plaintiff's age, education, and work experience in the light of her residual functional capacity if the final stage of the analysis is reached.  20 C.F.R. § 404.1520(a)(4)(v).

### III.    Summary of the Medical Evidence

On March 9, 2018, Plaintiff presented to Song Zang, M.D., for polyarthropathy.  (ECF No. 15, p. 319).  Her symptoms were moderate, though she had both joint and muscle pain.  (*Id.*).  In addition, she reported depression, stress, poor sleep, and fatigue.  (*Id.*).  She tried and failed multiple medications for fibromyalgia and her pain worsened with exertion.  (*Id.*).  Her physical exam was mostly normal, although she had tenderness to palpation in multiple muscle groups, but no joint swelling, and she had increased range of motion on multiple sites on her fingers.  (*Id.*, p. 321).  Dr. Zang assessed Plaintiff with chronic pain of multiple joints and other chronic pain.  (*Id.*, p. 322).  Dr. Zang also provided reading materials and prescribed Tramadol for her pain.  (*Id.*).

Plaintiff had a bilateral hip and knee x-ray on the same date.  (ECF No. 15, p. 324).  According to her bilateral hip x-ray, her joint space was well maintained, no osteophytes were seen, and it was largely normal.  (*Id.*).  Her bilateral knee x-ray was also largely normal, no joint osteophytes were seen, and her joint space was normal.  (*Id.*).

Plaintiff returned to Dr. Zang on March 30, 2018.  (ECF No. 15, p. 314).  She described her symptoms as moderate, occurring daily and being chronic, and she reported joint pain consistent with joint hypermobility.  (*Id*.).  She was tolerating her medications well and manifested no joint swelling or stiffness.  (*Id*.).  She was doing better compared to her last visit but still having pain.  (*Id*.).  Her physical exam was mostly normal, including normal muscle strength of her bilateral upper and lower extremities, and Dr. Zang assessed her with benign joint hypermobility and fibromyalgia.  (*Id*., p. 316).  Dr. Zang continued Plaintiff's current medication regimen including Tramadol, prescribed a knee and ankle brace, prescribed Xanax for sleep and anxiety, and discussed exercising.  (*Id*.).

On June 1, 2018, Plaintiff saw Dr. Zang for fibromyalgia syndrome.  (ECF No. 15, p. 309).  Her symptoms were reported as moderate, occurring daily, and being chronic.  (*Id*.).  Her physical exam was mostly normal except she had tenderness to palpation on multiple muscle groups.  (*Id*., p. 312).  Dr. Zang noted Plaintiff was tolerating her medication well and her symptoms were stable; however, she still had some pain, but most symptoms at the time were diarrhea and stomach pain.  (*Id*., p. 309).  Dr. Zang advised Plaintiff to continue her current medications, and he provided her reading material for irritable bowel syndrome ("IBS") since she might need treatments in the future.  (*Id*.).  Dr. Zang's assessment remained unchanged from Plaintiff's previous appointment.  (*Id*., pp. 309, 312).

Plaintiff presented to Patricia Walz, Ph.D., for a mental diagnostic consultative examination on August 2, 2018.  (ECF No. 15, pp. 325-329).  Plaintiff was on time and drove herself to the appointment.  (*Id*., p. 325).  When asked if she had mental health issues which affect her ability to work, Plaintiff stated she has a lot of anxiety, although she had not lost any jobs due to anxiety.  (*Id*.).  She tried to work the previous year but stated that between her medication

making her tired and the pain she couldn't do it.  (*Id*.).  She described her recent mood as tired, and stated she had suicidal ideation years earlier when she was put on Lyrica.  (*Id*.).  Her Lyrica medication was discontinued, the thoughts went away, and she has never made a suicide plan or attempt, nor has she had homicidal ideation.  (*Id*.).  She denied feeling depressed even though she was tearful.  (*Id*.).  Plaintiff described feeling sad, but not depressed.  (*Id*.).  She had no prior psychiatric hospitalization or counseling.  (*Id*.).  She started taking Xanax five years earlier, then stopped taking it for one year, then was prescribed Xanax again and took two or three tablets at night for sleep.  (*Id*.).  She had taken quite a few antidepressants such as Zoloft, Citalopram, Lexapro, Amitriptyline, Wellbutrin, and Cymbalta.  (*Id*.).  She completed high school and had no problems learning.  (*Id*., p. 326).  She even took a couple of college courses while in high school and completed certified nursing assistant ("CNA") training.  (*Id*.).  Her reading ability was good, but she sometimes had trouble remembering what she had read.  (*Id*.).

Dr. Walz noted Plaintiff could do basic math and knew how to manage money.  (ECF No. 15, pp. 326, 329).  Plaintiff reportedly worked as a nurse's aid from 2003 to 2016, but she was eventually fired because she called in too much.  She got along with coworkers and supervisors.  (*Id*., p. 326).  At that time, she was taking Tramadol 1-3 times per day and Neurontin.  (*Id*.).  She also had Oxycodone for post-surgery pain since her shoulder surgery.  (*Id*.).  Plaintiff felt her pain was as well managed as it could be, and she ranked her average pain level as a three on a 10-point scale.  (*Id*.).  She reported no problems with substance abuse.  Her mood was sad and anxious.  Dr. Walz observed no pain behavior, and noted that Plaintiff's attitude, speech, thought process, and thought content were all normal.  (*Id*., p. 327).

Plaintiff could drive and reported no problems with her driving.  (ECF No. 15, p. 328).  She did, however, avoid taking Neurontin or narcotics when she must drive.  (*Id*.).  To pass the time,

she enjoyed her dogs and when the kids were with her, and she played games or watched movies with them.  (*Id*.).  She reported having a few friends, with whom she did not do much since she had lately been more of a "homebody."  (*Id*.).  She left the house every day when the kids were there, but unless she had an appointment, she did not leave the house the rest of the week, and she had the kids with her about half of the week.  (*Id*.).

Plaintiff's social skills were good, and her speech was clear and intelligible.  (ECF No. 15, p. 328).  Her intellectual functioning was estimated to be in the low average to average range.  (*Id*.).  Her attention and concentration were fair but would be affected by her medication.  (*Id*.).  Dr. Walz concluded pain would be Plaintiff's most limiting factor.  (*Id*., p. 329).  Her speed of information processing was slow, and she seemed a bit groggy.  She could handle funds without assistance.  (*Id*.).  Dr. Walz's diagnostic impression was depressive disorder due to another medical condition (pain), panic disorder, and personality disorder with dependent traits.  (*Id*., p. 328).

On August 14, 2018, Plaintiff presented to Chester Carlson, D.O., for a physical consultative examination.  (ECF No. 15, pp. 333-338).  Dr. Carlson performed a physical exam which revealed mostly normal findings, including 5/5 muscle strength and normal use of her extremities.  (*Id*., pp. 336-337).  Plaintiff could hold a pen and write, touch fingertips to palm, oppose thumb to fingers, pick up a coin, walk on heels and toes, squat/arise from squatting position, had normal 100% grip in both hands, and had negative straight leg raises bilaterally.  (*Id*., p. 337).

Plaintiff saw William Knubley, M.D., on February 8, 2019, for a six-month follow-up appointment.  (ECF No. 15, p. 352).  She previously had a diagnosis of sleep apnea with a positive study but was not on any treatment.  (*Id*.).  She also was diagnosed with fibromyalgia and the possibility of Ehlers-Danlos syndrome.  (*Id*.).  She had right shoulder surgery performed one year earlier and was getting over that.  (*Id*.).  Robaxin had helped her neck pain, and Dr. Knubley

7

encouraged her to check back with pain management as well as with rheumatology.  (*Id*.).  Dr. Knubley noted there was not much else to do since Plaintiff utilized most of her treatments, except for some topical applications which she did not sound interested in.  (*Id*.).  Plaintiff still smoked one pack of cigarettes per day.  (*Id*.).

According to Dr. Knubley's notes, Plaintiff reported no myalgias, neck pain, back pain, joint pain, or falls.  (ECF No. 15, p. 354).  Her general physical exam was unremarkable, and she had normal strength, normal reflexes, and a normal gait.  (*Id*.).  Dr. Knubley's diagnostic impression was the following: untreated sleep apnea; tobacco use discontinuation recommended; obesity BMI 32; fibromyalgia on treatment but with neck and shoulder pain aggravated by previous motor vehicle accident; chronic low back pain; Ehlers Danlos syndrome; status post right shoulder surgery; bilateral cubital tunnel surgery; and bilateral carpal tunnel syndrome treated surgically.  (*Id*.).  Dr. Knubley provided a limited supply of Robaxin and referred her back to rheumatology to help with any treatment.  (*Id*.).  He also advised her to go back to pain management and set up a sleep study to reassess her sleep apnea.  (*Id*.).

Plaintiff returned to Dr. Knubley on September 16, 2019, complaining of chronic lower back pain.  (ECF No. 15, p. 356).  She still experienced chronic pain and stated her rheumatologist just gives her Robaxin and Tramadol.  (*Id*.).  She could not tolerate rhizotomies anymore because she said those injections caused so much pain, but they did help with some of the electric shock like sensations.  (*Id*.).  She complained of memory issues, but Dr. Knubley explained her memory issues were likely multifactorial and not anything neurologic.  (*Id*.).  She experienced side effects from medications in the past and Robaxin and Tramadol seemed to help, but Dr. Knubley was not sure he could offer much other than a retrial of low dose Cymbalta or Lyrica to see if she could tolerate it and if she developed any side effects.  (*Id*.).  Plaintiff's physical exam was unremarkable

except for pain reported in her shoulder, neck, and other areas.  (*Id.*, p. 358).  She displayed normal strength, had a normal gait, and exhibited normal senses and reflexes.  (*Id.*, pp. 358-359).  Dr. Knubley continued Robaxin, as needed, along with Tramadol, and he prescribed low dose Cymbalta at nighttime.  She was instructed to return in six months.  (*Id.*).

On November 8, 2019, Plaintiff was seen by Velvet Medlock, PT, for a physical therapy examination.  (ECF No. 15, pp. 362-363).  PT Medlock discussed Plaintiff's prior car accident, her complications from the accident, and her treatment.  (*Id.*, p. 362).  At the time of the physical therapy examination, Plaintiff was working at an assisted living facility participating in light duties, but she was not able to lift at work.  (*Id.*).  Her cervical spine range of motion was within normal limits, and her lumbar range of motion was within normal limits and within functional limits.  (*Id.*, pp. 362-363).  PT Medlock noted Plaintiff's rehab potential was good, but that her clinical presentation was unstable with unpredictable characteristics.  (*Id.*, p. 363).

PT Medlock prepared a physical medical source statement for Plaintiff on the same date. (ECF No. 15, pp. 364-378).  In an eight-hour workday, PT Medlock opined that Plaintiff could sit for a total of six hours, stand for one hour, and walk for one hour.  (*Id.*, p. 364).  Plaintiff could sit for 30 minutes at one time, stand for 15 minutes, and walk for 10 minutes before requiring a change of position.  (*Id.*).  Plaintiff did not need an assistive device to stand, walk, and balance, but she needed rest breaks at hourly intervals or less.  (*Id.*).  PT Medlock also found Plaintiff needed to alternate between sitting and standing as necessary or at 30-minute intervals or less.  (*Id.*).  On a sustained work basis, defined as once every three minutes for an eight-hour workday, PT Medlock concluded Plaintiff had the following lifting limitations: 0-5 pounds occasionally; 6-10 pounds occasionally; 11-20 pounds occasionally; 21-25 pounds rarely; and over 25 pounds rarely.  (*Id.*). PT Medlock felt Plaintiff could carry with the following limitations: 0-5 pounds occasionally; 6-

10 pounds occasionally; 11-20 pounds occasionally; 21-25 pounds rarely; and over 25 pounds rarely. (*Id*., p. 365).

Plaintiff's lower extremities were not limited, and her lower extremities did not need to be elevated above heart level when seated. (ECF No. 15, p. 365). She could use her upper extremities for the following activities: push/pull rarely; work in extended position rarely; work above shoulder level rarely; work overhead rarely; and reach occasionally. (*Id*.). Plaintiff could both grasp and engage in finger/fine manipulation occasionally. (*Id*.). She could perform the following maneuvers: balance and bend occasionally; rarely squat, crawl, stoop, crouch, kneel, and climb stairs; never climb ladders, ramps, and scaffolds. (*Id*., p. 366). Lastly, PT Medlock opined that Plaintiff should observe the following environmental restrictions: avoid all exposure to unprotected heights, dangerous moving machinery, handling vibrating tools, and extremes and sudden or frequent changes in temperature or humidity; avoid concentrated exposure to respiratory irritants; and avoid all exposure to driving/riding in commercial-type automotive equipment. (*Id*.).

## IV.    Discussion

Plaintiff raises one issue on appeal: whether substantial evidence supports the ALJ's RFC determination. (ECF No. 19, pp. 1-6).

RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545. A disability claimant has the burden of establishing her RFC. *Vossen*, 612 F.3d at 1016. The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations. *Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010); *Davidson v. Astrue*, 578 F.3d 838, 844 (8th Cir. 2009). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Miller*, 784 F.3d at 479

(citing *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)).  Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace.  *Perks v. Astrue*, 687 F.3d 1086, 1092 (8th Cir. 2012).  However, an ALJ is not required to adopt or include all limitations assessed by a medical source, even if the source is found to be persuasive.  *McCoy v. Astrue*, 648 F.3d 605, 615 (8th Cir. 2011) (in making an RFC determination, "we do not require an ALJ to mechanically list and reject every possible limitation.").

As the Eighth Circuit has recognized, a limitation to sedentary work "in itself is a significant limitation."  *Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005).  In addition, while Plaintiff clearly suffers from some degree of pain and discomfort, she has not established that she is unable to engage in all gainful activity.  *See Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000) (holding, the mere fact working may cause pain or discomfort does not mandate a finding of disability).  Plaintiff told Dr. Walz at her mental consultative examination in August 2018 that her pain was as well managed as it can be and on average her pain was only a three on a ten-point scale.  (ECF No. 15, p. 326).  Plaintiff also informed Dr. Knubley at an appointment in February 2019 that Robaxin helped her neck pain, and she exhibited an unremarkable physical exam, including normal strength, normal gait, and normal reflexes and senses.  (*Id*., pp. 352, 354).  At Plaintiff's next appointment with Dr. Knubley, she did report some pain, but she again had normal strength, a normal gait, and normal senses and reflexes.  (*Id*., pp. 358-359).  An ALJ may decide within a "zone of choice," and reversal is unwarranted simply because some evidence might support a different conclusion.  *Heino v. Astrue*, 578 F.3d 873, 879 (8th Cir. 2009).

In her Function Report, Plaintiff described hobbies such as swimming weekly in the summers, and activities such as shopping in grocery stores once a week with her kids, going outside

daily, visiting her parents weekly, paying bills, driving a car, doing laundry, preparing her own meals daily, vacuuming, dusting, washing dishes, and caring for pets.  (ECF No. 15, pp. 229-232, 245-248).  "[A]cts such as cooking, vacuuming, washing dishes, doing laundry, shopping, driving, and walking, are inconsistent with subjective complaints of disabling pain." *Medhaug v. Astrue*, 578 F.3d 805, 817 (8th Cir. 2009).  Moreover, as the Commissioner points out, evidence supports the ALJ's finding that Plaintiff had no manipulative limitations as her physical consultative examination revealed she could hold a pen and write, touch fingertips to palm, oppose thumb to fingers, and manifested full muscle strength and grip in both of her hands.  (ECF No. 15, pp. 336-337; ECF No. 20, p. 6).

Substantial evidence supports the ALJ's RFC determination.  Plaintiff has the burden of establishing her claimed RFC.  *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005).  She has failed to do so.

## V.      Conclusion

For these reasons, it is recommended that the Commissioner's decision to deny benefits be affirmed, and that the Plaintiff's Complaint (ECF No. 3) be DISMISSED WITH PREJUDICE.

**The parties have fourteen (14) days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  We remind the parties that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 15th day of July 2022.

/s/ Mark E. Ford
HON. MARK E. FORD
CHIEF UNITED STATES MAGISTRATE JUDGE